ZIEBELL, Appellant, vs. FRATERNAL RESERVE ASSOCIATION, Respondent.

*October 28—November 17, 1914.*

*Life insurance: Suicide: Presumption: Evidence: Copy of letter, when admissible: New trial: Newly discovered evidence.*

1. In an action upon a life insurance policy, the evidence is *held* to overcome the presumption against suicide and to show conclusively that the assured died from carbolic acid poisoning and that his death was intentionally self-inflicted.

2. A letter found on the body of the deceased had been given to his brother, who was subpœnaed to attend the trial and bring the letter. When he arrived he informed counsel that he had given the letter to his father, who had refused to give it back and who was then on a timber cruise in a distant county. Thereupon a subpœna *duces tecum* for the father was sent to the sheriff of that county, who made return that he was unable to find the witness. *Held,* that a copy of the letter, which had been made under the direction of the coroner, was properly received in evidence.

3. A motion for a new trial on the ground of newly discovered evidence is properly denied where such evidence could not change the result.

APPEAL from a judgment of the circuit court for Milwaukee county: J. C. LUDWIG, Circuit Judge. *Affirmed.*

Action to recover $790.50 upon a policy of life insurance

issued December 4, 1902, by the defendant upon the life of Dan E. Ziebell, the husband of plaintiff. Plaintiff was the beneficiary named in the policy sued upon, and it was in full force and effect on the 20th day of September, 1912, when Dan E. Ziebell died. It contained a provision that "In case of the death of the insured by suicide, sane or insane, voluntary or involuntary, this certificate shall be void." The defense was that the insured committed suicide by drinking carbolic acid.

It appears from the evidence that at the time of the death of the insured he and his wife were living at 450 Cass street, Milwaukee. In the forenoon of September 20th, between 10 and 11 o'clock, a neighbor found him lying about in the middle of the yard and telephoned to plaintiff, who went at once to where he was lying, but when she reached him he was growing cold and died without making any statement whatever. The police patrol took the body to the Emergency Hospital and from there it was removed to the morgue, and later to an undertaker who prepared it for burial, and it was buried at Wausau, where the relatives of the deceased lived.

Mr. Mayer, the assistant coroner, testified that after the body was taken away from the yard he went to the premises, examined them, and found an empty bottle labeled "carbolic acid" lying about ten or twelve feet from where the body lay; that he went to the drug store whose label was on the bottle and learned that the deceased had purchased carbolic acid there the night before. Mr. Goodloe, the druggist, testified that about 10 o'clock in the evening of September 19th he sold and delivered an ounce of carbolic acid to Mr. Ziebell, put up in an ounce bottle, labeled it, and registered the sale.

Nahin, the coroner, testified that death was the result of carbolic acid poisoning; that it was so plain that no *post-mortem* examination was necessary. Knospe, an assistant coroner who received the body, said he opened the mouth of

the deceased, smelled the odor of carbolic acid, and saw a burn on either the left or right side of the mouth. No traumatic injury to the body was discoverable. Dr. Scheele, who had charge of the Emergency Hospital, testified that the body was still warm when it was brought in but life was extinct; that there was a distinct odor of carbolic acid from the lips, tongue, and mouth, and that death was due to internal carbolic poisoning. The proof of death furnished by the plaintiff likewise so stated.

The evidence showed also that an action of divorce was pending between the deceased and his wife at the time of his death. And while his body was being cared for, the assistant coroner found a letter in his pocket which read:

"To the Public: I am broke now. *Mrs. Ziebell* got all that I have got in this world. I took her out of a sporting house and made a woman out of her. Now she turns me down this way. I hope the next man she gets will know enough not to let her handle the money. She stole my insurance policy in Duluth three years ago. She always was waiting for me to die. She has a painter on the string now. She wants to pull his leg now. I wish her good luck. Her father and mother deserted her, and I like a fool picked her up and made her what she is today. I hope she will get soaked with the painter and he gets my money. My clothing are at 208 Jenig Ave., I want my insurance policy paid over to Frankie Stevens of Oshkosh, Wisconsin. She is a cripple. She needs it more than the big sport I took out of the slums; so good by.                    DAN ZIEBELL."

This letter was identified by one Harry Homer, a bartender in a saloon on Wisconsin street, where Ziebell spent the night previous to his death. Homer furnished him with paper from a tablet and an indelible pencil and saw him write a letter. The original was not produced upon the trial, but a copy taken by the coroner was received in evidence, the absence of the original being satisfactorily accounted for.

On behalf of the plaintiff several witnesses who viewed the

body on the morning it was found said they saw no burns on the lips or mouth and smelled no odor of carbolic acid, and one witness testified that the bottle picked up labeled "carbolic acid" was a two or a two and one-half ounce bottle and that she had frequently seen such bottles of carbolic acid in the home of the Ziebells.

Plaintiff also moved for a new trial on the ground of newly discovered evidence. With the exception of affidavits to the effect that Ziebell was a drinking man and drank whisky, the only fact of importance contained in such affidavits was the statement of one Don Marion that he was in the company of Dan Ziebell on the evening of September 19th from 8 o'clock till 10 o'clock at different places other than the saloon in which Harry Homer was bartender,—he having testified that the deceased was in his saloon from about 8 o'clock in the evening till 5 the next morning,—and that when Ziebell left affiant he said he was going home—that he did not seem depressed, and spoke of going to Duluth the next day. The court directed a verdict for the defendant and refused to grant a new trial. Plaintiff appealed from a judgment entered in favor of defendant.

For the appellant there was a brief by *Louis L. Cohen,* attorney, and *Stover & Stover,* of counsel, and oral argument by *Mr. Cohen.*

*E. R. Hicks,* for the respondent.

VINJE, J. The salient facts attending the death of Dan E. Ziebell as disclosed by the evidence are contained in the foregoing statement. Many details that do not materially bear upon how he came to his death are omitted. From such facts in evidence only one reasonable conclusion as to the cause of his death can be drawn, namely, that he died from carbolic acid poisoning. Was such poisoning accidental or intentional? The presumption that arises from the mere fact of death is that it was not self-inflicted. *Krogh v. Mod-*

*ern Brotherhood,* 153 Wis. 397, 141 N. W. 276, and cases cited; *Pagel v. United States C. Co., ante,* p. 278, 148 N. W. 878. . But such presumption may be overcome by proof of facts and circumstances attendant upon the death showing that it was intentional and self-inflicted. In the present case all the major facts surrounding the death point unmistakably to suicide. The letter found upon the body is almost conclusive of itself that the death was intentionally self-inflicted. When coupled with the other facts established it would seem that no other reasonable conclusion could be drawn. He purchased carbolic acid the night before and undoubtedly carried the bottle on his person. No other bottle was found upon him, so he could not have taken the wrong bottle from his person and mistakenly have drunk from it. He made no outcry after drinking the poison though near his own home and that of others. That he was severely burned when he drank is established by the medical testimony in the case, and it is practically a matter of common knowledge. The facts that he knew what he drank and that he made no outcry or efforts to procure help spell only suicide. The letter referred to shows not only intent, but, together with the fact of the pending divorce action, supplies the reason for the suicidal act. In view of such evidence a verdict negativing suicide would have no substantial basis for its support, and would have to be set aside.

A point is made that the absence of the original letter was not sufficiently excused so as to justify the introduction of the copy. A copy was made under the direction of the coroner, the original was given to Henry Ziebell, a brother of the deceased, who gave it to his father, August Ziebell. Defendant's attorney did not know that Henry had given the letter to his father and he subpœnaed Henry to attend the trial and bring the letter. When Henry arrived at the trial he first informed counsel that he did not have the letter; that his father had it and had refused to give it back, and that

his father was then on a timber cruise somewhere in Vilas county, whereupon defendant's attorney issued a subpœna for August Ziebell, directing him to bring the letter, and sent the subpœna to the sheriff of Vilas county for service. The sheriff of that county made a return that after diligent search he was unable to find the witness desired. The copy was properly identified. We perceive no error in receiving it in evidence.

There was no abuse of discretion in denying the motion for a new trial. Concede that it could have been proved that the deceased, from about 8 to 10 in the evening before, was in company with Marion at places other than the saloon in which Mr. Homer was bartender. At best it would only have shown either the deceased did not come into the saloon where Homer worked till 10 or after or that he was absent from the saloon for a couple of hours. The testimony if true would not in the least have tended to negative the fact of suicide, though it might have shown that the witness Homer was mistaken as to part of the time he said the deceased was in his saloon. The evidence would still conclusively show suicide.

*By the Court.*—Judgment affirmed.